UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHEILA RAU, an Individual,<br><br>                    Plaintiff,<br>    v.<br><br>UNITED PARCEL SERVICE, INC., a Delaware Corporation; and UNITED PARCEL SERVICE, INC., an Ohio corporation,<br><br>                    Defendant. | Case No. 1:12-CV-00194-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

The Court has before it Defendant's Motion for Summary Judgment (Dkt. 24). The Court heard oral argument on July 26, 2013, and took the motion under advisement. For the reasons explained below, the Court will grant the motion for summary judgment.

**BACKGROUND**

United Parcel Service, Inc. ("UPS") is the world's largest package distribution company. UPS has a system of sorting facilities and operating centers dispersed throughout the United States, which employ full-time, part-time, and seasonal personnel. UPS is organized by geographic regions, which are divided into Districts. Districts are further divided into Divisions. Divisions consist of numerous package centers that serve local communities.

On December 2, 2002 Sheila Rau was hired by UPS as a part-time package loader at a package center in the Idaho Division. A year and half later, Rau was promoted by the Division Manager of Idaho to a position as a part-time supervisor. Over the next several years, Rau was continually promoted to management positions within UPS's Idaho Division, eventually taking a position as an On-Road Supervisor at the Nampa Center. Before taking the position as an On-Road Supervisor, Rau had never been the subject of any discipline or complaint related to her employment at UPS.

On January 5, 2011, Rau approached the Nampa Center Manager, Blane Hemmert, and requested to be moved to the Boise Center to work as an On-Road Supervisor. Rau told Hemmert that she could not work at Nampa anymore because she could not work with another Nampa supervisor, Robert Orloff. Rau and Orloff became romantically involved in February of 2010. In September of 2010, they discontinued their relationship and Orloff began a medical leave of absence. When Orloff returned to the Nampa Center in January 2011, Rau felt that she could no longer work with him.

Hemmert told Rau he would need to discuss the issue with the Division Manager, Phil Taylor. When Hemmert spoke with Taylor, Taylor instructed Hemmert to have Rau prepare a write up stating the facts of her relationship with Orloff. Both Rau and Hemmert prepared written statements that were delivered to Taylor. Taylor then delivered the statements to Angie Brewer, the Northwest District HR Manger.

**MEMORANDUM DECISION AND ORDER - 2**

On January 19, 2011, Don Tefft, the District Human Resources Operations Manager, and David Brandon, the District Security Manager, met with Rau to investigate her relationship with Orloff. The interview lasted over two hours, during which time Rau revealed conduct that violates several UPS policies. She disclosed that she had accompanied Orloff on a UPS business trip. On that trip, she had used a UPS rental car for her own personal use and ate meals likely paid for on Orloff's UPS issued American Express card. Tefft and Brandon discussed with Rau the excessive use of Orloff's UPS cell phone for personal calls between Orloff and Rau, and asked Rau to provide a copy of her phone records. Tefft and Brandon also discussed UPS's relationship policy with Rau, and informed Rau that several complaints had recently been lodged against her alleging she was dating a union driver. At the close of the meeting, Tefft and Brandon requested an additional written statement from Rau detailing Rau's relationship with Orloff, and her relationship with Billy Sartorius, a UPS driver who reported to Rau.

The following day, January 20, Tefft and Brandon met with Orloff and discussed policy violations related to his relationship with Rau. In addition to the conduct Rau reported, Orloff informed Tefft and Brandon that he and Rau had exchanged inappropriate text messages using Orloff's UPS issued cell phone. He disclosed that some of the texts sent by Rau contained explicit pictures of Rau.

After the January 19 and 20 meetings, Tefft and Brandon reported to Angie Brewer. Brewer told Tefft and Brandon to put Rau and Orloff on administrative leave

**MEMORANDUM DECISION AND ORDER - 3**

pending investigation. On January 21, 2011, Tefft and Brandon had a follow up interview with Rau. Rau admitted to sending explicit texts and pictures to Orloff's UPS issued cell phone. Rau was instructed to provide more detail about her relationships with Orloff and Sartorius. At the close of the meeting, Rau was told she was being taken out of service pending investigation and would receive further notification. That same day, Tefft and Brandon also met with Orloff and informed him that he was being taken out of service pending further investigation. Both Rau and Orloff continued to receive pay and benefits while out of service.

On January 24, 2011, Rau sent Steve Ward, one of her subordinate employees, a text message. The message read as follows: "I hope your hatred [sic] for the company you choose to work for was worth my career, my girls' future, and a friendship. You won. Karma is a nasty bitch, my friend." *Bennett Decl., Ex. 16*, Dkt. 27-16. Ward was worried about the message and reported it through UPS's employee complaint hotline. Ward also discussed it with a Nampa Center manager, who then reported the text to Phil Taylor. Taylor instructed Ward to draft a statement. Ward drafted a statement stating he perceived the message to be threatening and retaliatory. *Bennett Decl., Ex. 18*, Dkt. 27-18. UPS has a retaliation policy that states that "[a]nyone who retaliates against another employee for reporting known or suspected violations . . . [is] subject to disciplinary action, up to and including dismissal." *Bennett Decl., Ex. 19*, Dkt. 27-19.

**MEMORANDUM DECISION AND ORDER - 4**

On January 28, 2011, Rau was called to a meeting with Phil Taylor and Don Tefft. Taylor told Rau that due to recent events in her personal life, he had lost confidence in her. Tefft then presented Rau a draft separation agreement for her review and consideration. The agreement offered Rau four months of severance pay. Rau asked if she was being terminated, and Tefft informed her that the decision had not been made. *Bennett Decl., Ex. 4* at 83:18-25, Dkt. 27-4. He told her that if the decision to terminate was made, the settlement offer would be off the table. Tefft instructed Rau to seek counsel of an attorney in reviewing the agreement.

Following the meeting, Rau obtained counsel and began negotiations with UPS over the terms of the separation agreement. Rau first asked for one year of severance pay. UPS declined this offer and insisted on four months of pay. Rau replied that she would agree to nine months of severance pay or, in the alternative, she would agree to be transferred to Payette and continue employment with UPS. UPS declined this offer and agreed to pay Rau six months of wages. Rau's counsel was informed that "[i]f Ms. Rau declines this offer, she needs to contact Mr. Tefft for further information regarding discipline and her employment status." *Fischer Decl., Ex. M*, Dkt. 34-8. Rau accepted UPS's offer, and the parties entered into a separation agreement on March 9, 2011.

During that time, on February 4, 2011, Orloff met with Brewer and Taylor, and was offered a similar severance package. Taylor told Orloff that he could not trust him because of his conduct. Orloff's separation agreement offered 2 months of severance pay.

**MEMORANDUM DECISION AND ORDER - 5**

Orloff was similarly advised to review the agreement with counsel. Orloff was not told that the investigation had been concluded or that his employment would be continued if he rejected the separation agreement. After the meeting, Orloff consulted his attorney. He decided to reject the separation agreement and "fight for [his] employment." *Bennett Decl., Ex. 11* at 78:5-18, Dkt. 27-11.

On March 11, 2011, UPS contacted Orloff and instructed him to report to work as an On-Road Supervisor at the Payette Center. UPS informed Orloff that as a result of his conduct he would be disciplined. Orloff's discipline included: (1) the loss of any merit bonus pay for 2011, (2) the loss of a 2011 increase in compensation; and (3) the loss of his UPS American Express Card. On March 15, after learning that Orloff was transferred to Payette, Rau revoked her separation agreement. Rau wrote UPS and accused UPS of discrimination. Rau requested an additional year and a half of severance pay. *Bennett Decl., Ex. 29*, Dkt. 27-29. UPS declined Rau's offer and wrote Rau informing her that her "HR Manager and/or Division Manager will be contacting her to inform her when and where she should show up for work Monday morning." *Bennett Decl., Ex. 30*, Dkt. 27-30. On Monday, April 4, 2011, Rau met with Brewer and Taylor. They informed Rau that UPS expected her to report to the Boise Center as an On-Road Supervisor. They also informed her that she would face discipline for her conduct. Her discipline included: (1) the loss of her merit bonus pay for 2011; (2) the loss of any chance for a raise in 2011; and (3) the loss of her UPS American Express Card privileges.

Rau requested additional time to talk with her counsel. UPS informed Rau's counsel that Rau had until April 8 to decide to return to work. UPS stated that "Ms. Rau's failure to return to her position will be a decision to voluntarily quit her employment at UPS." *Bennett Decl., Ex. 31*, Dkt. 27-31. Rau did not report to work, and UPS took the position that Rau voluntarily abandoned her employment.

Rau responded with this law suit, alleging the following claims against UPS: (1) sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, and the Idaho Human Rights Act ("IHRA"); (2) wrongful treatment and termination in violation of public policy; (3) breach of the implied covenant of good faith and fair dealing; (4) intentional infliction of emotional distress; and (5) negligent infliction of emotional distress.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case."  *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.  *Id.* at 255.  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor.  *Deveraux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions,

answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *Celotex,* 477 U.S. at 324.

## ANALYSIS

### 1.  Title VII Claim

The proper framework for determining whether Rau's gender discrimination claim should survive summary judgment is the familiar burden-shifting scheme set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, Rau must first establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) similarly situated men were treated more favorably or her position was filled by a man. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). It is important to remember that the requisite degree of proof necessary to establish a *prima facie* case for Title VII discrimination on summary judgment is minimal and does not even rise to the level of a preponderance of the evidence. *Id.*

If Rau establishes a *prima facie* case, the burden shifts to UPS to articulate some legitimate, nondiscriminatory reason for the challenged action. *Id.* at 1064. If UPS does so, Rau must then show that the articulated reason is pretextual either through direct evidence of discriminatory intent or circumstantial evidence showing that UPS's

proffered explanation is unworthy of credence. *Id.* If Rau relies on circumstantial evidence to show pretext, the evidence must be both specific and substantial. *Id.*

### A. *Prima Facie Case*

UPS does not dispute that Rau is a member of a protected class. UPS does dispute that Rau meets her minimal burden of showing that: (1) she suffered an adverse employment action; (2) she was qualified for the position; and (3) similarly situated men were treated more favorably than her.

### (1) Adverse Employment Action

To satisfy the adverse employment action requirement, Rau asserts that she was actually terminated by UPS when she was initially removed form service on January 21, 2011. However, there is no evidence in the record to support this position. When Rau was put on administrative leave pending investigation, she was never told she was terminated and was informed that no decision had been made regarding termination. *Bennett Decl., Ex. 4* at 83:18-25, Dkt. 27-4; *see Bennett Decl., Ex. 1* at 157:12-22, Dkt. 27-1. While Rau was on leave, she remained on UPS's payroll and understood she was still employed. *Bennett Decl., Ex. 1* at 186:1-14, Dkt. 27-1. Throughout negotiations of Rau's severance package, UPS advised Rau that she was being disciplined for her conduct. *Fischer Decl., Exs. K, M, P*, Dkt. 34-8. Rau was never advised that she was being fired. Therefore, Rau has failed to establish that UPS actually terminated her employment.

In the alternative, Rau argues that she was constructively discharged by UPS. The Ninth Circuit has held that constructive discharge is only established if working conditions "become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job . . . ." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (citation omitted); see also *Watson v. Nationwide Ins., Co.*, 823 F.2d 360, 361 (9th Cir. 1987). In general, "adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." *Tomco v. Prada USA Corp.*, 484 F. App'x 99, 100 (9th Cir. 2012) (quoting *Turner v. Anheuser–Busch, Inc.*, 876 P.2d 1022, 1027 (1994)).

Rau argues that she was constructively discharged by UPS because her continued employment with UPS after the breakdown of negotiations would have been "impossible and intolerable." *Fischer Decl., Ex. R*, Dkt. 34-8. In support of this argument, Rau contends that her removal from service and the invasive nature of the investigation regarding her personal relationships with co-workers created adverse working conditions. *Id.* Moreover, Rau argues that she could not be expected to return to work at the Boise Center, given her manager's comments that he had lost confidence in her and UPS's disparate treatment of her and Orloff. *Id.*

Taking the evidence in the light most favorable to Rau, the Court cannot see how a reasonable trier of fact could find that she was "driven from the workplace." *Brooks*, 229

F.3d at 930. UPS's investigation into her work relationships does not appear to be anything other than routine. Rau asserts the investigation was based on rumors. However, UPS received several legitimate complaints about Rau's work relationships and reasonably concluded that it needed to investigate such complaints. *See Bennett Decl., Exs. 8-9*, Dkt. 27. Moreover, though Phil Taylor's comments to Rau in the January 28 meeting were stern, they were not egregious or extraordinary. *See Bennett Decl., Ex. 1* at 158:1-25, Dkt. 27-1. Rau states that it "would have been very difficult" to work for Taylor, but provides no evidence indicating that it would have been intolerable for her to continue to work under his management. Furthermore, the fact that Orloff was transferred to Payette, the center Rau requested during negotiations, does not suggest that Rau's transfer to Boise was intolerable—Boise was the center she originally requested. Also, there is no evidence that the disciplinary conditions Rau received upon transfer to the Boise Center were discriminatory or egregious. Finally, taken as a whole, Rau's claims do not show "a continuous pattern of discriminatory treatment" or reveal any other "aggravating factors." *Tomco*, 484 F. App'x at 100. Thus, Rau cannot show working conditions sufficiently intolerable to support a finding that she was constructively discharged.

However, Rau asserts that a different standard is applicable where a severance package has been offered. In the retirement context, the Ninth Circuit has acknowledged "that an employee may demonstrate that the decision to resign or retire was involuntary

under circumstances not involving intolerable or discriminatory working conditions."
*Knappenberger v. City of Phoenix*, 566 F.3d 936, 940 (9th Cir. 2009). When an employee

alleges coercion, "[i]t is the employee's burden to come forward with sufficient evidence

to demonstrate that a reasonable person in [his] position would feel he had no choice but

to retire." *Id.* at 941 (citation omitted). Although the Court was unable to find any Ninth

Circuit cases that address severance packages under this standard, the Court finds that

coerced resignation is sufficiently analogous to coerced early retirement for this standard

to apply. *See Lojek v. Thomas*, 716 F.2d 675, 683 (9th Cir.1983) (suggesting an employee

coerced into resigning could demonstrate he left his employment involuntarily).

But even under a coercion theory, the evidence does not support a claim of

constructive discharge. First, Rau did not accept the severance package—Rau withdrew

her acceptance before it became valid. After withdrawing the severance agreement, Rau

was still employed by UPS and was never told she would be terminated. Second, Rau

was encouraged to review the severance offer with an attorney, given time to consider the

agreement, and was able to negotiate for more agreeable terms. Third, although Rau

believed that she could either accept the package or be terminated, Rau is unable to show

that "termination would have been inevitable." *Id.* It is clear that she had the choice

between two alternatives: accept the severance package or accept whatever disciplinary

action UPS determined appropriate. Such a "choice between two unpleasant alternatives .

. . does not of itself establish that a resignation was induced by duress or coercion." *Id.*

(quotation marks omitted). Moreover, at the time Rau actually resigned (following her withdrawal of the severance agreement), there was no threat of termination—Rau was informed of the disciplinary action that would be taken, and the disciplinary action did not include termination. Overall, Rau's allegations do not support a claim that UPS's conduct deprived Rau of free will and coerced her resignation. Therefore, the Court concludes that Rau cannot meet a minimal showing to establish constructive discharge. As a result, Rau cannot establish the second element of a *prima facie* case of gender discrimination under Title VII.

### (2) Qualification for Position

Rau argues that she was qualified for the position of On-Road Supervisor at UPS. UPS cites to policy violations as evidence Rau was not qualified or performing to UPS's expectations. However, the fact that Rau was transferred to Boise to fill the position of On-Road Supervisor, after all of her alleged policy violations had already been reported, supports a finding that Rau was qualified for a position as an On-Road Supervisor. Accordingly, the Court finds that Rau has established the third element of a *prima facie* case of gender discrimination.

### (3) Similarly Situated

The Ninth Circuit has stated that "individuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2001). Attempting to clarify the law in the Ninth Circuit

concerning what constitutes similarly situated individuals, one district court, interpreting

Vasquez and other Ninth Circuit opinions in the context of a racial discrimination claim,

recently concluded that the "ultimate question that is informed by the similarly situated

analysis is whether there is a basis for inferring discriminatory motive: Does the

purported purpose of the challenged action require similar treatment of the two

employees or does it justify different treatment due to differences in their status or

situation rather than race?"[1] *Bowden v. Potter*, 308 F. Supp. 2d 1108, 1117 (N.D. Cal.

2004). In *Bowden*, the court suggested that the issue of similarly situated status is

therefore fact specific, not subject to a mechanical or formulaic approach. *Id.*

In this case, taking the facts in the light most favorable to Rau, the Court finds that

Rau has not met her minimal burden of establishing that similarly situated men were

treated more favorably. Rau and Orloff were both supervisors at UPS and were similarly

situated. They also displayed similar conduct. Both of them violated the same or similar

UPS policies when they engaged in their affair. However, there is no indication that

Orloff received more favorable treatment than Rau. Orloff was put on administrative

leave on the same day as Rau. Both were offered severance packages before the

investigation into their violations was concluded. Upon rejecting the severance packages,

both were transferred to different centers to fill similar positions and were given identical

disciplinary consequences. Neither was given a choice or preference in transfer locations.

---

[1] It is reasonable to assume the court would use the same test in a gender discrimination case by simply
replacing the word "race" with "gender."

Although Orloff was transferred sooner than Rau, Orloff also rejected the severance agreement and ended negotiations before Rau. The difference in their approach to negotiations justifies the slightly different outcome in timing of placement. Rau has therefore failed to meet her minimal burden of establishing a similarly situated male was treated more favorably.

Thus, Rau has failed to meet two elements of a *prima facie* case of gender discrimination under Title VII—Rau cannot show that she suffered an adverse employment action or that similarly situated men were treated more favorably. Rau's failure to establish a *prima facie* case is sufficient reason for the Court to grant summary judgment as to Rau's Title VII claim. However, before granting summary judgment on this claim, the Court finds it instructive to review UPS's reasons for its actions and Rau's evidence of pretext.

### B.  Legitimate, Nondiscriminatory Reason for Termination

If Rau had met her burden of establishing a *prima facie* claim, the burden would have shifted to UPS to articulate some legitimate, nondiscriminatory reason for Rau's termination. *See Villiarimo*, 281 F.3d at 1062. UPS states that it had several legitimate reasons to discipline Rau. UPS asserts it disciplined Rau because her conduct violated the electronic communications policy, the professional conduct policy, the code of business conduct, the integrity policy, the relationship policy, and the retaliation policy. *Bennett Decl., Ex. 13* at 113:17-24, Dkt. 27-13. There is no dispute that Rau engaged in a

relationship with a co-worker, sent inappropriate texts and pictures to a UPS cell phone, and sent a retaliatory text to a subordinate employee. It is also undisputed that a UPS employee may be terminated for violation of the retaliation policy. *Bennett Decl., Ex. 19*, Dkt. 27-19. UPS therefore met its burden of articulating a legitimate, nondiscriminatory reason for terminating Rau.

### C. Pretext

Rau must show that UPS's articulated reason is pretextual either through direct evidence of discriminatory intent or circumstantial evidence showing that UPS's proffered explanation is unworthy of credence. *See Villiarimo*, 281 F.3d at 1062. Rau fails to offer any evidence of discriminatory intent, but suggests that UPS's explanation is unworthy of credence. Accordingly, Rau's evidence must be both specific and substantial. *Id.*

Rau has failed to introduce specific and substantial evidence showing UPS's proffered explanation is unworthy of credence. Rau contends that Mr. Orloff was involved in the same affair and violated the same policies as Rau, and that only she was terminated. Thus, she asserts a male employee was treated more favorably than her, and without explanation. However, there is no evidence that Orloff received more favorable treatment. When Orloff was offered a severance package, he was given nearly the same instructions as Rau. Phil Taylor similarly told Orloff that he couldn't trust him, and Orloff left the meeting with the feeling he would be terminated. The fact that he rejected

the agreement sooner than Rau was a result of his desire to "fight for [his] employment," rather than accept severance. *Bennett Decl., Ex. 11* at 78:5-18, Dkt. 27-11. Rau had that same option and choose to negotiate for better terms of severance. It was only at the point when Rau and Orloff chose different approaches to UPS's severance offer that UPS's treatment of Rau and Orloff started to differ. Any difference in treatment from that point on is justified by Rau and Orloff's different approaches to negotiation. There is no evidence that this explanation is not worthy of credence.

Rau also argues that UPS's explanation of why Orloff was transferred to Payette instead of Rau is not credible. Angie Brewer, the HR Director who reassigned both Rau and Orloff, testified that Rau did not have the skill set necessary to take the position in Payette. *Bennett Decl., Ex. 13* at 120-124, Dkt. 27-13. Rau states in her affidavit that she was more qualified for the Payette position than Orloff based on her employment history. *Rau Aff.* ¶¶ 12-15. Dkt. 35. However, there is no supporting evidence in the record beyond her statements, and her statements alone, especially her description of Orloff's work experience, are too vague to constitute substantial evidence of pretext.

Rau further argues that UPS's reliance on her violation of the retaliation policy is disingenuous and not credible. In support of this argument, Rau cites Phil Taylor's statement Rau's single retaliatory text message to a subordinate would not warrant termination in this particular case. *Fischer Decl., Ex. C* at 75:3-22, Dkt. 34-3. However, Phil Taylor was not the decision maker in Rau's case. While his statement provides some

evidence that UPS might not have terminated Rau for retaliation, it does not provide substantial evidence contradicting Angie Brewer's statements that the text message was considered as part of Rau's numerous violations. Even if the text message alone was insufficient for termination, the combined violations appear to be sufficient. Thus, Rau has failed to meet her burden of producing substantial evidence of pretext.

In short, the Court finds that Rau was not a victim of sexual discrimination under Title VII. Rau cannot meet the minimal burden to establish a *prima facie* case of gender discrimination. Moreover, Rau cannot show that UPS's reasons for its actions were pretextual. Accordingly, summary judgment is granted as to Rau's Title VII claim.[2]

## 2. Wrongful Termination

Rau was an at-will employee. The Idaho courts have recognized a public policy implied-in-law covenant in employment contracts, so that "an employer may be liable for wrongful discharge [of an employee at will] when the motivation for discharge contravenes public policy." *Sorensen v. Comm Tek, Inc.*, 799 P.2d 70, 74 (Idaho 1990). "In order for the public policy exception to apply, the discharged employee must: (1) refuse to commit an unlawful act, (2) perform an important public obligation; or (3) exercise certain rights or privileges." *Thomas v. Medical Center Physicians, P.A.*, 61 P.3d 557, 564 (Idaho 2002).

---

[2] The IHRA analysis is identical, and hence summary judgment as to that claim must likewise be granted.

Whether a particular action falls within the public policy exception is a question of law. *Edmondson v. Shearer Lumber Prods.*, 75 P.3d 733, 737 (Idaho 2003). The Idaho Supreme Court has explained the exception as "balance[ing] the competing interests of society, the employer, and the employee in light of modern business experience." *Crea v. FMC Corp.*, 16 P.3d 272, 275 (Idaho 2000) (internal quotation marks omitted). The exception has been extended to specifically protect (1) participation in union activities, *Roberts v. Bd. of Trustees*, 11 P.3d 1108, 1111 (Idaho 2000); (2) reporting safety violations, *Ray v. Nampa School Dist.*, 814 P.2d 17 (Idaho 1991); and (3) reporting false medical records and the performance of unnecessary operations, *Thomas v. Med. Ctr. Physicians*, 61 P.3d 557 (Idaho 2002).

The Idaho Supreme Court has indicated that the exception would also protect against termination for refusing to date a supervisor, filing a worker's compensation claim, or serving on a jury. *Sorensen*, 799 P.2d at 75. In *Sorensen*, the Court stated that if the termination violated a statutory prohibition, it would more likely constitute a violation of public policy. *Id.*

Here, Rau claims that she was terminated in violation of Title VII, and that this violates public policy. The Court was unable to find an Idaho case which specifically holds that the termination of an employee for reasons related to their gender, race, or national origin violates public policy. However, the Court is satisfied that a termination for reasons related to an employee's gender would be recognized by the Idaho courts as a

termination in violation of public policy. *See Stalder v. Fred Meyer Stores, Inc.*, CV-05-399-E-BLW, 2007 WL 1029020 (D. Idaho Mar. 30, 2007). Nevertheless, as discussed above, Rau's claim fails because she cannot establish that UPS wrongful discharged her on the basis of her gender. Thus, summary judgment is granted as to Rau's wrongful termination claim.

### 3.  Breach of Implied Duty of Good Faith and Fair Dealing Claim

Rau alleges that "[b]y treating Rau less favorably than male co-workers, and wrongfully discharging her from employment on the basis of gender, UPS breached the implied covenant of good faith and fair dealing." *Compl.* at ¶ 63, Dkt. 1. The implied-in-law covenant of good faith and fair dealing exists in all employment relationships, including employment at-will relationships. *See Sorensen v. Comm Tek, Inc.*, 799 P.2d 70, 75 (Idaho 1990); *see also Mitchell v. Zilog, Inc.*, 874 P.2d 520, 526 (Idaho 1994). "A breach of the employment covenant is a breach of the employment contract, and is not a tort. The potential recovery results in contract damages, not tort damages." *Metcalf v. Intermountain Gas Co.*, 778 P.2d 744, 748 (Idaho 1989). Moreover, "the covenant protects the parties' benefits in their employment contract or relationship, and . . . any action which violates, nullifies or significantly impairs any benefit or right which either party has in the employment contract, whether express or implied, is a violation of the covenant . . . ." *Id.* at 749.

It seems apparent that treating a similarly-situated employee differently, based upon her gender, "violates, nullifies or significantly impairs" a benefit or right which she has in their employment contract, and would therefore violate the implied covenant of good faith and fair dealing. While the Court was unable to find an Idaho case so holding, it is convinced that the Idaho courts would, if faced with that specific question, reach the same conclusion reached here. Nevertheless, because Rau cannot establish gender based discrimination, she has failed to establish a breach of the covenant of good faith and fair dealing. Thus, summary judgment is granted as to Rau's breach of the covenant of good faith and fair dealing claim.

### 4.  Intentional Infliction of Emotional Distress Claim

In order to state a claim for intentional infliction of emotional distress, Rau must show that (1) UPS's conduct was intentional or reckless; (2) the conduct was extreme or outrageous; (3) there was a causal connection between the wrongful conduct and her emotional distress; and (4) the emotional distress was severe. *See Edmondson v. Shearer Lumber Products*, 75 P.3d 733, 740 (Idaho 2003). To be extreme or outrageous, conduct has to be more than simply objectionable or unreasonable. *See Alderson v. Bonner*, 132 P.3d 1261, 1268 (Idaho App. 2006). "Even if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" *Edmondson*, 75 P.3d at 741.

Rau fails to provide evidence that UPS's conduct was extreme or outrageous, or that her emotional distress was severe. Even if UPS's treatment and discipline of Rau could be considered unreasonable, it simply cannot be regarded as atrocious or beyond all possible bounds of decency that would cause an average member of the community to believe it was outrageous. Additionally, allegations of distress, anxiety, loss of sleep, humiliation, and appetite changes because one no longer works for her previous employer is not severe emotional distress. Liability only results when emotional distress is so severe that no reasonable person could be expected to endure it. *See Davis v. Gage*, 682 P.2d 1282, 1288 (Idaho App.1984). That is not the case here. Accordingly, the Court will grant summary judgment on Rau's intentional infliction of emotional distress claim.

## 5.  Negligent Infliction of Emotional Distress Claim

To state a claim for negligent infliction of emotional distress, Plaintiffs must allege facts supporting "(1) a duty recognized by law requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the conduct and the plaintiff's injury; and (4) actual loss or damage." Johnson v. McPhee, 147 Idaho 455, 210 P.3d 563 (Idaho Ct.App.2009) (citing Brooks v. Logan, 127 Idaho 484, 903 P.2d 73, 78 (Idaho 1995); Black Canyon Racquetball Club, Inc. v. Idaho First Nat'l Bank, 119 Idaho 171, 804 P.2d 900, 904–05 (Idaho 1991); Nation v. State Dept. of Correction, 144 Idaho 177, 158 P.3d 953, 965 (Idaho 2007)). Plaintiffs must also

allege "some physical manifestation of the [their] emotional injury." Id. (citations omitted).

UPS moves to dismiss this claim on the basis that Rau cannot show that UPS has an established duty. UPS cites to two recent Idaho District Court cases holding that a negligent infliction of emotional distress claim is not cognizable in the employment context. *See Feltmann v. Petco Animal Supplies, Inc.*, 2:11–cv–414–EJL–MHW, 2012 WL 1189913, *5 (D. Idaho Mar. 20, 2012) (holding that "Idaho courts would not recognize a claim for NIED" brought by an at-will employee); *Sommer v. Elmore Cnty.*, 903 F. Supp. 2d 1067, 1076 (D. Idaho 2012) (finding the ruling in *Feltmann* persuasive, and holding that an at-will employee alleging NIED did not state a claim for relief). The court in *Feltmann* noted that "Idaho courts have never recognized a common law duty to keep the workplace free of emotional stress," and that the Idaho Supreme Court denied "such a claim, reasoning that employment at-will cannot be converted into a guarantee of employment by bringing an emotional distress claim." *Id.* (citing *Sorensen v. Saint Alphonsus Regional Medical Center, Inc.*, 118 P.3d 86 (Idaho 2005). This Court finds the reasoning and conclusions in *Feltmann* and *Sommer* persuasive, and holds that summary judgment is appropriate on Rau's negligent infliction of emotional distress claim.

## 6.  Motion to Strike

Rau asks the Court to strike portions of Defendant's reply brief and the declaration of Scott Randolph. Whether the Court denies the motion or grants it and strikes the material

makes no difference to the Court's ultimate decision in this matter. Accordingly, the motion is moot.

## ORDER

**IT IS ORDERED:**

1.    Defendant's Motion for Summary Judgment (Dkt. 24) is **GRANTED**.

2.    Plaintiff's Motion to Strike (Dkt. 39) is **Moot**.

3.    Judgment will be entered separately.

DATED: July 31, 2013

_____

B. Lynn Winmill
Chief Judge
United States District Court